UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| MARIA NOLEN, | ) |
| **Plaintiff,** | ) ) ) |
| vs. | ) ) Civil Action Number ) **5:16-cv-00238-AKK** |
| THE DIOCESE OF BIRMINGHAM IN ALABAMA, et al., | ) ) ) |
| **Defendants.** | ) ) |

## MEMORANDUM OPINION AND ORDER

This case arises out of a dispute between Maria Nolen, the former principal of St. Ann Catholic School ("St. Ann"), a small catholic grammar school located in Decatur, Alabama, and her previous employer, the Diocese of Birmingham (the "Diocese"), an administrative body that controls the operations of the Roman Catholic Church in much of the state. Doc. 36 at 2; Doc. 48 at 1.[1] Nolen alleges that St. Ann and its employees discriminated against Hispanic students, and that the Diocese discharged her in retaliation for her attempts to stop these practices, a violation of 42 U.S.C. § 1981. *Id.* at 9. Nolen also raises three related state law claims: breach of contract; intentional interference with a contract; and defamation *per se*. *Id.* at 11–14. The Diocese has filed a motion for summary judgment on all

---

[1] Nolen's Second Amended Complaint names various other organizational and individual defendants, but for the sake of simplicity, the court will treat the Diocese as the sole defendant in this case.

1

of Nolen's claims, and that motion is now ripe for review.[2] Based on a thorough review of the law and evidence, the court finds that summary judgment in favor of the Diocese is due to be granted on Nolen's § 1981 claim, the only claim over which this court has original jurisdiction, as well as on her breach of contract claim. In light of this ruling, the court declines to exercise supplemental jurisdiction over Nolen's remaining state law claims and dismisses those claims without prejudice.

## II. STANDARD OF REVIEW

Summary judgment is properly granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[2] The Diocese filed its motion for summary judgment on June 27, 2017. Doc. 47 at 1. Per this court's Scheduling Order, Nolen had 21 days from that date to file a responsive pleading. Doc. 18 at 7. Nolen requested, and was granted, a three day extension of time to file her response. Doc. 52. Nolen then requested two additional extensions, unilaterally extending her filing deadline. Doc. 59 at 1. Those additional motions were granted in part, and this court set a final filing deadline of July 28, 2017 for Nolen's response. Doc. 57 at 2. Rather than comply with this ruling, Nolen requested yet another extension of time, doc. 58, which the court denied, doc. 59. Accordingly, this case was deemed submitted on Defendant's motion for summary judgment. Doc. 59 at 2. Pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, if a party fails to "properly support an assertion of fact or fails to properly address another party's assertion of fact," summary judgment is appropriately granted if the movant carries their burden.

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255. However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam). "[A] . . . 'scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment.'" *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (quoting *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004)).

## III. FACTS

The Diocese hired Nolen in July of 2012 to serve as St. Ann's principal. Doc. 48 at 1; Doc. 36 at 2. As part of her hiring, Nolen signed a one year renewable contract providing that she could be discharged only for cause. Doc. 36-1 at 1.[3] The contract also bound Nolen to observe the policies of the "Diocesan Catholic School Board," and notified her that she was considered "a representative of the Diocese." *Id.* In her role as principal, Nolen "made most employment, financial, and educational decisions for [St. Ann]." Doc. 36 at 5. She was also charged with promoting a Christian atmosphere within the school and insuring that

---

[3] The contract explains that the "failure of the Employee to perform services expected under this contract in a satisfactory manner or conduct or omissions in the personal and professional activities of the Employee . . . in violation of regulations of the Diocese . . . [or] failure of the employee to provide complete and accurate information about . . . teaching credentials . . . or other background information" all provide cause for termination. Doc. 36-1 at 1.

the teachers integrated Christian values into their lesson planning. Doc. 49-2 at 10, 14–15. Nolen also frequently led the school in prayer and organized a variety of religious activities for students and faculty. *Id.* at 11–14.

At the time Nolen was hired, St. Ann was experiencing financial hardship and had seen its enrollment decrease significantly. Doc. 36 at 4. To deal with this situation, Nolen began an aggressive outreach program marketing the school to the local Hispanic community. Nolen also arranged access to scholarship funds from a number of Student Scholarship Organizations to assist under-privileged students meet St. Ann's cost of attendance. *Id.* at 5. As the student body increased in number, Nolen decided to hire a secretary, Veronique Edington ("Edington"), to assist with her administrative duties. *Id.* Edington's husband is a member of St. Ann's advisory board and also a financial advisor to the Diocese.

Nolen asserts that Edington "made many derogatory comments toward . . . Hispanic students, families, and scholarship applicants." *Id.* at 5–6. Allegedly Edington also repeatedly declined to assist Nolen with school programs involving Hispanic students and families. *Id.* at 6. As a result, Nolen reprimanded Edington and also reported these incidents to the superintendent of the Diocese's parochial school system, Fran Lawlor, as well as the cleric in charge of St. Ann, Father Raymond Remke. *Id.* at 6–7. On October 24, 2014, Edington resigned from her position after a meeting with Nolen and the system superintendent addressing her

4

behavior.  *Id.* at 7.  Purportedly, St. Ann's advisory board, on which Edington's husband served, began expressing anti-Hispanic sentiment and growing hostility toward Nolen following Edington's resignation.  *Id.*

On December 10, 2014, Father Remke, Nolen's direct supervisor, accused Nolen of embezzlement and demanded her immediate resignation.  *Id.*  Two days later, Father Remke met with Nolen and required her to sign a letter resigning her position.  *Id.*  It is undisputed that during her tenure at St. Ann Nolen wrote checks to herself even after being instructed not to do so.  Doc. 49-2 at 15, 51.  It is also undisputed that on at least two occasions Nolen improperly requested reimbursement for mileage well in excess of actual distance travelled.  *Id.* at 48, 52.[4]  Further, in the summer of 2014, St. Ann learned that Nolen was not even properly certified to serve as a principal in Alabama.  *Id.* at 30.  The school prompted Nolen to complete the certification process as soon as possible, but she failed the certifying examination held in August of 2014, and had not retaken the test when she resigned in December of that same year.  *Id.* at 30–31.

## IV. DISCUSSION

The heart of Nolen's complaint is her allegation that her attempts to protect Hispanic students and families at St. Ann from racial discrimination resulted in her

---

[4] St. Ann's bookkeeper, Marina Gauthier, also noted many other accounting discrepancies regarding Nolen's use of school funds.  Doc. 49-9 at 14–15.

retaliatory discharge in violation of 42 U.S.C. § 1981.  More specifically, Nolen asserts that she sought to curtail discriminatory anti-Hispanic behavior at St. Ann's and, in particular, repeatedly confronted her secretary Edington, over her discriminatory actions and remarks.  Allegedly, these efforts caused the school to retaliate against Nolen and eventually resulted in her forced resignation.  In response, the Diocese contends that the First Amendment to the United States Constitution creates a ministerial exception precluding this court from applying federal anti-discrimination law to employment disputes arising between a church and one of its ministers.  Because, the Diocese argues, Nolen qualifies as a minister, the ministerial exception applies to bar review of her § 1981 claim.

The religious clauses of the First Amendment read as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I.  While the internal tension between these two constitutional commands has been well-documented, the Supreme Court has made clear that "[b]oth Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S 171, 181 (2012).  This constitutional grounded ministerial exception provides "that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is

6

the church's alone."[5] *Id.* at 195 (internal citation omitted). Indeed, in the ministerial context, a flat prohibition on court interference with employment decisions makes sense because the judiciary is particularly ill-equipped to conduct a post-hoc inquiry into whether an employment dispute between a minister and a religious organization is premised on secular rather than religious grounds. *See* Paul Horwitz, *Act III of the Ministerial Exception*, 106 Nw. U. L. Rev. 973, 979 (2012) (explaining that "judges cannot evaluate the kinds of religious questions that come up in employment discrimination cases involving ministerial employees . . . [because they] are simply incompetent to address them").

Turning to the facts, the parties do not dispute that the Diocese is a religious organization and is entitled to assert the ministerial exception as an affirmative defense. The only question before this court related to the application of the exception is whether Nolen, the principal of a Catholic parochial school, qualifies as a minister. Although not committing to any specific formula for deciding that question, the Supreme Court has delineated at least four factors for consideration: "[1] the formal title given . . . by the Church, [2] the substance reflected in that

---

[5] Although *Hosanna-Tabor* dealt with a claim brought under the Americans with Disabilities Act, 104 Stat. 327, 42 U.S.C. § 12101 *et seq.* (1990), this circuit also applies the ministerial exception to employment actions brought under § 1981. *See Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 492–94 (5th Cir. 1974); *see also McCants v. Alabama-West Fla. Conf. of United Methodist Church, Inc.*, 372 F. App'x 39, 40–42 (11th Cir. 2010) (explaining that plaintiff's § 1981 claim is "barred by the ministerial exception emanating from the Establishment and Free Exercise Clauses of the First Amendment").

7

title, [3] [the employee's] own use of that title, and [4] the important religious functions . . . performed for the Church." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834 (6th Cir. 2015) (quoting *Hosanna-Tabor*, 565 U.S. at 192).

Of these factors, the primary focus is typically placed on an analysis of the "function performed by persons who work for religious bodies." *Hosanna-Tabor*, 565 U.S. at 198 (Alito J., concurring); *see also Fratello v. Archdiocese of New York*, 863 F.3d 190, 205 (2d Cir. 2017) (explaining that a functional analysis should primarily determine whether an employee qualifies as a minister). Significantly, and relevant here, the title of minister may be applied to many employees of a religious organization and "is not limited to the head of a religious congregation." *Hosana-Tabor*, 565 U.S. at 190; *see also Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 180 (5th Cir. 2012) (relying on a church's music directors important role in "furthering the mission of the church and conveying its message to its congregants" to justify application of ministerial exception); *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1168–69 (4th Cir. 1985) (holding that if the position is "important to the spiritual and pastoral mission of the church" the employee may properly be considered a minister for purposes of the ministerial exception). Moreover, an employee can still qualify as a minister even if she routinely performs administrative tasks in addition to her

ministerial duties. *See Hosanna-Tabor*, 565 U.S. at 193 (rejecting the view that ministers must serve exclusively religious functions).

Here, the undisputed record evidence leaves little doubt that Nolen's role as principal of a Catholic grammar school falls within the general ambit of the ministerial exception. First, the Diocesan School Mission Statement and the related Policy Manual for Catholic Schools, both applicable to Nolen via her employment contract, highlight the vital role education plays within the Catholic Church. For example, the Policy Manual provides, among other things, that "[r]eligious instruction and formative experiences are a primary and essential part of the school's program directed toward leading the student to deepening faith and commitment to Christ." Doc. 49-10 at 1. The Manual also provides that "the development of Christian values as well as the principles of Church teachings . . . permeate and integrate all the subject areas." *Id.*

These documents also delineate the specifically religious functions the principal plays as part of her role in leading the school community. Among other things, the principal is instructed to "provide a Christian perspective of a life centered on Jesus Christ" and must insure "that teachers integrate Christian truths and values in the subjects taught . . . [in addition to making] sure that classrooms incorporate objects of the Catholic faith into the learning environment." Doc. 49-4 at 44. Critically, Nolen's deposition testimony reveals that these broad policy

statements accurately reflected her duties as she understood them.  Specifically, Nolen testified that (1) she was intimately involved in the school's religious mission, and more generally in the Catholic community centered around the school; (2) she frequently led the school in prayer, organized various religious events, and oversaw the religious department, a responsibility which included the development of appropriate lesson plans; (3) she sometimes taught religious classes for adults at the school; and (4) she viewed herself as an official representative of the Catholic Church in the broader community.  Doc. 49-2 at 11–15.

Although Nolen lacks a formal religious title and performed non-religious administrative tasks, these facts conclusively demonstrate that she possessed a significant "role in conveying the Church's message and carrying out its mission." *Hosanna-Tabor*, 565 U.S. at 192.  Therefore, in light of the overwhelming and undisputed evidence in the record, this court finds that Nolen qualifies as a minister and that resolution of her § 1981 claim would require judicial encroachment into the internal affairs of the Roman Catholic Church.[6]  While

---

[6] This conclusion is not at all remarkable as numerous courts have similarly concluded that the ministerial exception applies to principals and teachers working in religiously affiliated schools. *See, e.g.*, *Fratello*, 863 F.3d at 206 (holding that although the "lay-principal" of a catholic school lacked a formal religious title "the record makes clear that she served many religious functions to advance the School's Roman Catholic mission"); *Cannata*, 700 F.3d at 178–79 (finding that a music director totally lacking religious education, training and experience qualified for the ministerial exception because the role of a church musician is to draw "the congregation closer to

society's interest in the enforcement of laws regulating employment relationships is undoubtedly vital, the First Amendment makes clear "[t]he church must be free to choose those who will guide it on its way." *Hosanna-Tabor*, 565 U.S. at 196. Thus, Nolen's claim for retaliation under § 1981 is foreclosed as a matter of law,[7] and summary judgment in favor of the Diocese is appropriately granted.[8]

---

Christ, and allowed the congregation to act together in celebration by singing praises and hymns to the Lord, which in turn strengthens the faith that is in them").

[7] This court notes that there is some authority indicating that the ministerial exception also applies to breach of contract claims, at least to the extent those claims concern the ability of a religious organization to select its ministers. *See Hutchison v. Thomas*, 789 F.2d 392, 393, 396 (6th Cir. 1986) (affirming dismissal of a breach of contract claim because resolution of the claim involved "internal church discipline, faith, and organization, all of which are governed by ecclesiastical rule, custom, and law"); *see also Nevius v. Africa Inland Mission Int'l*, 511 F. Supp. 2d 114, 120 (D.D.C. 2007) (explaining that it could not resolve a breach of contract claim against a church because "the court's inquiry in this matter would tread too closely to religious affairs"). Accordingly, this court concludes that the ministerial exception also applies to Nolen's breach of contract claim as resolution of that claim would require significant intrusion into internal church policy, an area not subject to interference by the state. Further, as noted *infra* at n.8, Nolen has failed to contest the numerous facts in the record showing the Diocese had cause to discharge her. Accordingly, Nolen's breach of contract claim also fails as a matter of law and is due to be dismissed.

[8] Alternatively, the Diocese argues that even if the ministerial exception does not apply, St. Ann's had good cause to discharge Nolen because of her failure to satisfactorily fulfill the functions of her position at the school. Section 1981 retaliation claims are governed by the familiar "tripartite analytical framework developed by the Supreme Court in *McDonnel Douglas Corp. v. Green*." *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009). This framework requires the plaintiff to first establish a prima facie case creating a presumption that any adverse employment action suffered was the result of retaliation. *Id.* at 1307–08. The burden of production then shifts to the defendant to rebut the presumption by "articulating a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 1308. Finally, to prevail, the plaintiff must show that the defendant's proffered reason is a mere "pretext to mask discriminatory actions." *Id.* Here, the Diocese has presented numerous legitimate reasons for Nolen's discharge, including the repeated misuse of school funds and the failure to meet certification requirements in the State of Alabama. Doc. 49-2 at 15, 30, 51. Either failing would provide the school with legitimate cause to terminate Nolen under the terms of her employment contract. Doc. 36-1 at 1. Despite repeated opportunities to do so, Nolen has presented no evidence at all to demonstrate St. Ann's proffered reasons for her discharge are pretextual. Accordingly, her retaliatory discharge claim under § 1981 fails as a matter of law.

In light of this court's decision to grant summary judgment in favor of the Diocese on both Nolen's § 1981 claim and her claim for breach of contract, only Nolen's defamation and intentional interference with a contract claims, each governed by state law, remain. As a general matter, "[i]n any civil action of which the district courts have original jurisdiction, [they also] have supplemental jurisdiction over all other claims [forming] part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §1367(a). However, after "the district court has dismissed all the claims over which it has original jurisdiction," supplemental jurisdiction over any remaining claims may properly be denied. 28 U.S.C. § 1367(c)(3).

The Supreme Court has instructed that when all federal-law claims are eliminated before trial, "the balance of factors to be considered[9] . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726 (1966) (explaining "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well").[10] Additionally

---

[9] These factors are "judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).
[10] Since the Supreme Court decision in *Cohill* the principles of supplemental jurisdiction have been codified in § 1367, but the Eleventh Circuit has explained that the factors the Supreme

the resolution of Nolen's remaining claims depends exclusively on questions of state law, and the Eleventh Circuit has instructed that "[s]tate courts, not federal courts, should be the final arbiters of state law." *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997). Therefore, because the law permits Nolen to toll the statute of limitations under certain circumstances, the considerations of judicial economy, fairness, and convenience all strongly tilt in favor of dismissal.[11] Accordingly, the court dismisses Nolen's remaining claims of defamation *per se* and intentional interference with a contract without prejudice so that she may refile in state court thus enabling Alabama courts to properly determine the future course of Alabama law. *See Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir. 1999) (explaining if state-law claims are dismissed on jurisdictional grounds "they should be dismissed without prejudice so that the claims may be refiled in the appropriate state court").

## V. CONCLUSION AND ORDER

For the foregoing reasons, the Diocese's Motion for Summary Judgment, Doc. 47, is **GRANTED** as to Nolen's § 1981 claim and her claim for breach of

---

Court has previously articulated continue to apply. *See Palmer v. Hosp. Auth. of Randolph County*, 22 F. 3d 1559, 1569 (11th Cir. 1994).

[11] Dismissal of these claims will not result in any significant additional costs to the parties. Discovery is complete on both of Nolen's surviving claims, and, as a result, the parties will not have to take any depositions or exchange any paper discovery. In fact, the Defendants can simply refile their motion for summary judgment in state court and request a ruling on the basis of the evidence already submitted to this court.

contract. These claims are **DISMISSED** with prejudice. Nolen's remaining state law claims are **DISMISSED** without prejudice. The clerk is **DIRECTED** to close this file.

**DONE** the 1st day of September, 2017.

                                        _____
                                              **ABDUL K. KALLON**
                                        UNITED STATES DISTRICT JUDGE